**Floyd WILLIAMS, et al., Plaintiffs,**

**v.**

**OWENS–ILLINOIS, INC., Defendant,**

**No. C–75–1197 RHS.**

United States District Court,
N. D. California.

Jan. 8, 1979, as amended May 17, 1979.
Judgment, March 15, 1979, as amended May 17, 1979.

---

George T. Withy, Allan C. Miller, Elaine Gertsler, Ginger Gould, Withy, Gould, Miller & Gertsler, Berkeley, Cal., for plaintiffs.

Marvin D. Morgenstein, Michael A. Kahn, Mary C. Castle, Steinhart, Goldberg, Feigenbaum & Ladar, San Francisco, Cal., for defendant.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

SCHNACKE, District Judge.

The Findings of Fact and Conclusions of Law herein are based upon the findings of the Court and, in those cases of unanimous agreement by the Jury, upon the Jury's verdict. As to matters not unanimously agreed to by the Jury, the Court has found the facts to be in accordance with the view of a majority of the jurors.

On or before January 19, 1979, the parties shall submit proposed forms of judgment, suggestions of the relief appropriate to the findings of fact relating to the class of female employees, memoranda relating to the back pay due plaintiff Alice Brice, and

any other matters properly to be brought to the attention of the Court. All of such matters will be heard at 9:30 a. m., on Friday, February 2, 1979.

## THE CLASS OF BLACK EMPLOYEES

1. Defendant's Oakland Plant is located in Oakland, California, on the border of Alameda, California. It is within commuting distance of the California cities of Oakland, Hayward, Alameda, San Leandro, Fremont, Richmond, San Lorenzo, Union City and Berkeley. During the period January, 1971 through July 31, 1978 the following percentage of its employees were hired from those cities: Oakland—46.1%; Hayward—12.4%; Alameda—9.7%; San Leandro—8.6%; Fremont—4.0%; Richmond—3.13%; San Lorenzo—3.1%; Union City—2.4%; Berkeley—1.8%; other cities—8.6%.

2. Of the persons hired in the period from March 7, 1971, through July 31, 1978, and still employed on July 31, 1978, 35% were Black, 41% were White, and 23% were non-Black minority; information on the remaining 1% was not available.

3. The work force statistics by race of all employees at the Oakland Plant for the following years was as follows:

| | |
|---|---|
| 1971: | Minority—30.5% |
| | Black—14.8% |
| | Caucasian—69.5% |
| March 31, 1973: | Minority—31% |
| | Black—20% |
| | Caucasian—69% |
| August 31, 1974: | Minority—38.5% |
| | Black—19% |
| | Caucasian—61.5% |
| March 31, 1975: | Minority—39% |
| | Black—19% |
| | Caucasian—61% |
| March 31, 1976: | Minority—40% |
| | Black—20% |
| | Caucasian—60% |
| March 31, 1978: | Minority—45% |
| | Black—23% |
| | Caucasian—55% |

4. In the initial assignment of new hires, Owens-Illinois did not discriminate against Black employees. The evidence established that assignment of new employees was based upon job openings and qualifications of the employee without regard to the race of the employee.

5. With respect to all employees who were paid an hourly rate, which employees composed 90% of the work force of the Oakland plant, Black and non-Black employees were paid the amounts required to be paid to them pursuant to the collective bargaining agreements applicable to those jobs, and no Black employee was paid either less than the amount required to be paid pursuant to a collective bargaining agreement or less than a non-Black employee in a similar job.

6. With respect to salaried employees, Black employees were paid an amount equal to non-Black employees for similar work, and no Black employee was paid less than the amount established by a bona fide job evaluation system for the job performed.

7. The percentage of Black employees hired by the Oakland plant commencing March 7, 1971 when compared with the percentage of Black persons in the civilian work force for the cities from which it would be anticipated that employees for the Oakland plant would be hired, demonstrates that the Black percentage of persons hired was equal to or greater than the number of Black persons in the applicable civilian work force, so that no finding can be made that Owens-Illinois discriminated against Black persons in hiring from a comparison of the civilian work force statistics with the Oakland plant statistics.

8. Black employees were not placed in jobs within departments, or in special departments, because of their race. The placing of employees was based upon job vacancies in the departments and the qualifications of the employees seeking those vacancies, without regard to race.

9. When an employee was employed in a job covered by a collective bargaining

agreement, the promotion of that employee in hourly jobs was controlled by the system provided in the employee's collective bargaining agreement, and Owens-Illinois followed the procedure for promotion established by the collective bargaining agreements.

10. Promotion of employees, from hourly jobs to salaried jobs, and promotion of employees in the salaried jobs, was not made with regard to the employee's race, nor were Black employees as a class denied promotions because of their race.

11. The variance and regression analyses introduced into evidence by plaintiffs did not establish, or support a claim that Owens-Illinois discriminated against its employees in their pay on the basis of the race of the employee, or the sex of the employee.

12. Plaintiffs failed to prove that Owens-Illinois engaged in any policy, pattern, or practice of terminating Black employees because of their race.

13. Job vacancies in the hourly jobs at the Oakland plant have been filled without regard to the employee's race. Where a job vacancy was a promotion pursuant to a collective bargaining agreement, the job was filled pursuant to the terms of the collective bargaining agreement, without regard to the race of the applicant. Where the job was not a promotion within a department, but was an entry into the department, it was filled without regard to the race of the applicant.

14. Vacancies in salaried jobs at the Oakland plant were filled without regard to the race of the applicant.

15. Job vacancies in the Teamster, Warehouse, Corrugated and Mold Repair departments required that the vacancies be filled through hiring halls pursuant to collective bargaining agreements between Owens-Illinois and the unions which represented the employees within the departments. Entry into the Maintenance, Central Mold Shop, Machine Repair and Forming departments were through apprenticeship programs administered by the union which represented the employees in the department

and Owens-Illinois. The use of the union hiring halls and the use of the apprenticeship programs did not discriminate against any Black employees because of their race.

16. There is no evidence that Black employees as a class were denied jobs for which there were vacancies since March 7, 1971.

17. Since March 7, 1971, the procedure for promotion of hourly employees and the pay of those employees has been covered by collective bargaining agreements between Owens-Illinois and the union representing the employees of the department. The requirements of the agreements for promotion and pay of union employees has been adhered to by Owens-Illinois at all times since March 7, 1971; and the effect and impact of the provisions of the collective bargaining agreements has not had any adverse impact or effect upon Black persons as a class and has not had the effect of denying any job or promotion or pay increase or any other term or condition of employment to any Black person because of his race.

18. Since March 7, 1971, there was no evidence that Black persons as a class were denied jobs for which there were vacancies in any department at the Oakland plant.

19. During the trial plaintiffs offered evidence of isolated acts or practices which had occurred prior to March 7, 1971 with respect to Black persons. There was no evidence that any of those acts or practices continued, or had any present effect or impact upon Black persons, subsequent to March 7, 1971.

20. Since March 7, 1971 Owens-Illinois has not engaged in any policy, pattern or practice in hiring employees at its Oakland plant which either discriminated against, or had any adverse impact or effect upon Black persons because of their race.

## CONCLUSIONS OF LAW

1. This claim was brought pursuant to F.R.Civ.P., Rule 23(b)(2), by plaintiffs who sought to represent, and were certified to represent, a class of all Black employees

who were employed by Owens-Illinois at any time since March 7, 1971.

2. Since March 7, 1971, Owens-Illinois has not engaged in any pattern or practice which discriminated against its Black employees as a class in violation of either 42 U.S.C. § 1981 or Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.

3. Such class of employees are not entitled to relief, injunctive or otherwise.

## CLASS OF FEMALE EMPLOYEES

1. Since March 23, 1974 the Owens-Illinois Oakland plant has at all times employed between 1600 and 2000 employees in approximately 21 departments. Between 30% and 35% of the work force during this period of time have been female employees.

2. Since March 23, 1974 approximately 70% of the job vacancies at the Oakland plant have been in three job classifications: lehr attendant, carton assembler, and selector.

3. The job of selector requires the employee to inspect bottles which are moving along an assembly line and to pack them into cartons for delivery. The selector must check the quality of bottles and discard the defective ones. The job requires a small amount of manual dexterity but generally can be accomplished by anyone.

4. The job of carton assembler requires the employee to take flat pre-stamped pieces of corrugated cardboard and assemble them into cartons and place the separators inside of them. This job requires some small degree of manual dexterity and may require a degree of strength as occasionally cardboard blanks in bundles must be lifted; however, basically anyone can perform this job.

5. The job of lehr attendant requires the employee to remove cartons filled with bottles of various sizes from a rapidly moving conveyor and place them on trailers and pallets at the rate of between 10 and 30 boxes a minute. This job requires little manual dexterity, however, it is extremely physically demanding and exhausting and requires a great deal of endurance and physical strength.

6. At all times since March 23, 1974 the pay of lehr attendants, selectors, and carton assemblers have been set forth and required by collective bargaining agreements between Owens-Illinois and the Glass Bottle Blowers Association Union.

7. Since March 23, 1974 very few women have filled the lehr attendant job.

8. Since March 23, 1974 most of the carton assemblers and selectors have been women.

9. Since March 23, 1974 almost all selector job vacancies have been filled from outside Owens-Illinois. Applicants for this job were received from the Department of Human Resources Development, screened in the company personnel office, and sent to the selecting foreman for ultimate hiring or rejection. Most persons sent by the Department of Human Resources Development were ultimately hired.

10. Since March 23, 1974 carton assembler and lehr attendant job vacancies have been filled from outside of Owens-Illinois by the above described procedure and by job postings. The job posting is a procedure whereby a notice of the job opening is posted throughout the plant, union employees sign the job posting, and the job is filled on the basis of seniority. Since the job of lehr attendant continually has vacancies in it, a permanent lehr attendant job posting was kept in the personnel office. All persons signing a job posting for lehr attendant or carton assembler had priority over any non-Owens-Illinois employee for these jobs.

11. Since March 23, 1974 very few women signed job postings or otherwise applied for lehr attendant jobs despite the fact that the job postings on their face stated "females are encouraged to apply." Women who did sign up for the job of lehr attendant and were the most senior on the list were awarded the job with rare exception.

12. Lehr attendant job postings were, generally speaking, awarded to persons with low seniority. On the other hand, other jobs in the selecting department, such

as inspector and lehr foreman, were invariably awarded to persons with extremely high seniority (between 10 and 20 years). The result was that many women who were unable to achieve inspector jobs could easily have posted for and received lehr attendant jobs but elected not to take the lehr attendant job. On occasion, when Owens-Illinois laid off employees from the selecting department, women selectors with higher seniority than male lehr attendants elected to be laid off rather than take the lehr attendant job which they could have obtained.

13. The lehr attendant job is performed standing up and has not become physically less demanding over the years; whereas the selector job is performed sitting down and has become easier due to mechanization over the years.

14. There was no evidence that a single woman applied for or posted for the job of lehr attendant and was refused such job.

15. Since March 23, 1974, most of the women employed at the Oakland plant were employed in the finished products department and very few women, if any, were employed in the mold repair, central mold shop, corrugated, forming, trucking, warehouse, maintenance, and batch and furnace departments.

16. In the departments in which few women have been employed since March 23, 1974 there is a very low rate of turnover and most of the employees employed in those departments during this period of time were employed by Owens-Illinois prior to March 23, 1974. Approximately 75% of all job vacancies during this period of time have occurred in the lowest entry level positions at the Oakland plant classified in the EEO category of operatives and laborers.

17. Since March 23, 1974 women were employed when qualified and available in the vacancies in the eight departments in which few women are employed. Thus, since March 23, 1974 at least seven women were employed in the batch and furnace department as general laborers, at least two women were employed in the maintenance department as apprentices, at least one woman was employed in the machine repair department as a machinist helper, at least one woman was employed in the central mold shop as a mold inspector, at least six women were employed in the corrugated department as corrugators and a large number of women were employed in the maintenance department. Additionally, some women who were hired since March 23, 1974 in these departments subsequently quit or left Owens-Illinois for their own reasons and these persons are not reflected in either the exhibits or the plaintiffs' or defendant's statistics.

18. In the departments in which very few women were employed since March 23, 1974 all jobs above entry level were filled through job postings. Entry level jobs in trucking, warehouse, corrugated, and mold repair were filled exclusively from union hiring halls; maintenance, central mold shop, and forming from apprenticeship programs. The hiring hall and apprenticeship program mechanisms were established pursuant to union-management agreements and were administered jointly by the union and the company. There was no evidence that the hiring halls or apprenticeship programs had a discriminatory purpose or effect.

19. Most entry level jobs in the mold repair, trucking, central mold shop, machine repair, forming, warehouse, batch and furnace, and maintenance department, require a high degree of specialized skill or are extremely dirty, heavy work.

20. Since March 23, 1974 there was no evidence that a qualified woman applied for and/or was denied a vacancy in the machine repair, central mold shop, corrugated, forming, trucking, warehouse, maintenance, and batch and furnace departments. There was, however, evidence of women being offered and accepting or refusing entry level positions and apprenticeships in these departments.

21. Plaintiffs introduced a myriad of statistics during the trial. These statistics were, in large part, confused, and misleading. The statistics relied upon unreal and contrived wage and pay figures, excluded

large populations of the plant including new hires and non-Black minorities, and were deficient in other ways.

22. Since March 23, 1974 between 32% and 37% of the employees hired at the Oakland plant have been women. There was no evidence that any qualified woman applied for and was denied employment at the Oakland plant.

23. Since March 23, 1974 the terms and conditions of the employment including pay, promotions, terminations, and treatment of 90% of the female employees was governed, in large part, by the collective bargaining agreements between the company and the union which represented employees in each of the separate departments, and the Court finds these agreements to be non-discriminatory.

24. Since March 23, 1974 the Oakland plant had in effect salary and hourly job posting mechanisms whereby vacancies in 95% of the positions at the Oakland plant were brought to the attention of all employees who then had an opportunity to bid on such jobs. Approximately 90% of the time the job was then awarded to the senior person. If the senior person was not awarded the job, it was because such person lacked the necessary qualifications for the job.

25. During the course of the trial, plaintiffs introduced evidence of Owens-Illinois' dealings with the federal government compliance agencies, including the adoption by the Oakland plant of a special program for an "affected class" which included women who were purportedly not promoted out of the selector job between 1942 and 1973. However, this action and other activities between the office of the contract compliance and Owens-Illinois regarding enforcement of the Executive Orders 11246 and 11375 were not per se probative of any discriminatory activity at the Oakland plant after March 23, 1974.

26. That Owens-Illinois management has discretion to decide who will be promoted to a few union positions and all non-union positions by being the primary judge of whether an applicant has the ability for a particular job.

27. That Owens-Illinois has used its discretion to promote men over women because of their sex.

28. That there is a large available pool of women both within the plant and in the surrounding communities who are qualified for managerial positions.

29. That throughout the relevant period, Owens-Illinois has intentionally engaged in a pattern and practice of promoting only men into its management positions even though qualified women were available.

30. That there are no written standards or guidelines for promotion to management level jobs. All promotions except for the top five positions at the plant are determined by the individual supervisor of the departments in which there is a management vacancy. There is no system whereby any management job openings are publicized to the employees, and there is no system of applying for these jobs. Normally, supervisors choose a candidate for a job without the candidate's knowledge.

31. That throughout the relevant period, Owens-Illinois has had management training positions in which it has placed men both as new hires and as transfers from other jobs in the company. The position of student industrial engineer in the cost control department was the major training job for management employees. Women were not chosen for entry into this program even though qualified women were available at the plant and in the general population.

32. That despite the fact that most employees in the finished products/selecting department are women, virtually none of the supervisors of that department have been women during the relevant period.

33. That the policies and practices of Defendant regarding promotion, especially into management positions, have unduly restricted females both from promotions into these positions and from the promotion process itself, since the Oakland plant has had virtually no female supervisors or management personnel.

## CONCLUSIONS OF LAW

1. That Defendant has engaged in conduct with the purpose and effect of discriminating against women, on account of sex, in that Defendant has:

a. Unduly limited the initial hiring of women for management training positions.

b. Unduly limited the promotion of women to supervisory and management level positions.

2. That this Court shall determine appropriate relief in accordance with these findings.

## CLAIM OF AUNITA JONES

1. Aunita Jones is a 31-year-old Black woman.

2. Aunita Jones was hired by Defendant Owens-Illinois on July 14, 1971 as a secretary in the personnel department at Defendant's Oakland Plant.

3. Aunita Jones was the first Black employee ever hired by Defendant in its personnel department at its Oakland Plant.

4. Before she was hired, Aunita Jones was interviewed by Defendant's assistant personnel director, Mike Lunny. During this interview Mr. Lunny asked Ms. Jones how she would respond if she were called a "nigger". He told her that as the first Black person hired in the personnel department, her performance would determine whether other Blacks were hired into personnel.

5. After she began working for Defendant, Aunita Jones was subjected to racial insults by a co-worker. Aunita Jones complained to her supervisors about this conduct including the director of personnel, but no apparent remedial action was taken, and Aunita Jones continued to be subjected to this treatment.

6. In November 1974, Mr. Joe Woods was placed in the assistant personnel director's job. Bart Oxley then asked Aunita Jones to train Mr. Woods even though he continued to maintain that she was unqualified for the job. In December 1974, Aunita Jones transferred out of the personnel office to the maintenance department as a secretary.

7. Thereafter on several occasions Aunita Jones complained to the personnel director about racially discriminatory policies of the company and about his conduct in particular in racial matters.

8. In June 1975, Aunita Jones was accused by Defendant of forging the name of a doctor employed by the company to a disability claims form which Aunita Jones had submitted to her own private insurance company.

9. Aunita Jones at all times denied she had committed this forgery.

10. Defendant did not in good faith believe that Aunita Jones had forged the form.

11. The claims form was not related to any job duties for which Aunita Jones was responsible.

12. Defendant terminated Aunita Jones on June 6, 1975. The reason stated for termination was that Aunita Jones had forged the claims form. Defendant also charged alternately that Aunita Jones had not recorded days she was sick on her attendance card.

13. In fact, Aunita Jones had recorded her days absent but she had mistakenly recorded the absence in the wrong week. Defendant was aware and informed that Aunita Jones had in fact recorded all her absent days.

14. The reasons stated by Defendant for terminating Aunita Jones were a mere pretext. In fact, Aunita Jones was terminated by Defendant because of her race and because of her outspoken opposition to discrimination against Black persons by Defendant.

15. The acts of Defendant described above were done intentionally and wantonly and for the purpose of discriminating against Aunita Jones because of her race and her actions to combat the racially discriminatory acts of Defendant.

16. Defendant did not subject its White employees to the treatment described above which Defendant subjected Aunita Jones to.

17. That at the time Aunita Jones was terminated on June 6, 1975, she was employed in a Grade 4 position as a secretary in the Maintenance Department.

18. That she became employed at the rate of $600.00 per month in August, 1975.

19. That she received $50.00 raises every six months.

20. That as of July 24, 1978, she was earning $850.00 per month.

21. That therefore Aunita Jones earned $25,400 since her termination.

22. That Aunita Jones would have earned an additional $6,888.50 if she had continued to be paid at the same rate, with normal raises, as she was paid as of her termination date.

23. Since March 7, 1971, Owens-Illinois did not engage in any act or practice in her compensation, training, or promotion which either discriminated against, or had any adverse impact or effect upon, Aunita Jones because of her race.

24. Since March 23, 1974, Owens-Illinois did not engage in any act or practice with respect to her compensation, training, promotion, treatment, termination, or terms, conditions, or privileges of employment which discriminated against Aunita Jones, or had any adverse impact or effect upon her, because of her sex.

## CONCLUSIONS OF LAW

1. Since March 23, 1974, Owens-Illinois did not discriminate against Aunita Jones because of her sex in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.

2. Defendant Owens-Illinois did discriminate against Aunita Jones on the basis of her race in violation of 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., and Aunita Jones is entitled to a judgment against Owens-Illinois, Inc. in the amount of $15,000 compensatory damages, $15,000 punitive damages and back pay of $6,888.50.

## CLAIM OF ROBERT HAROLD

1. That Robert Harold is a Black male who worked for Owens-Illinois from April 9, 1968, to September 6, 1977. He became the first Black maintenance mechanic at the plant after completing the apprentice program.

2. That during the relevant period, Robert Harold was a temporary leadman eight or nine times and was the first Black temporary leadman.

3. That when Robert Harold was temporary leadman the Defendant failed to support his authority while it did support the authority of similarly situated White employees.

4. That on one occasion when Robert Harold was temporary leadman, one of his crew threw water in his face; and that the management official in charge and present at that time intentionally and wantonly did nothing to indicate company disapproval and in fact intentionally and wantonly joined in the amusement of the all-white crew thereby ratifying said action and failing to support the authority and dignity of a temporary leadman whereas the company did so support the authority and dignity of similarly situated White employees.

5. That on one occasion, when Robert Harold was a temporary leadman, a member of his crew named George set the time clock ahead so that he could leave early and still be paid for an eight hour day.

6. That Robert Harold reported this incident to the proper company official and yet the company paid George his full eight hour salary, thereby intentionally and wantonly failing to support the authority of Robert Harold as temporary leadman whereas the company did so support the authority of similarly situated White employees.

7. That on several occasions when Robert Harold was a temporary leadman, Steve Greenwood, a member of his crew, refused to carry out the assignment given to him by Robert Harold.

8. That Robert Harold reported this to the proper company official and that no action was ever taken by the company and

thereby the company intentionally and wantonly refused to support the authority of Robert Harold as temporary leadman whereas the company did so support the authority of White employees similarly situated.

9. Since March 7, 1971 Owens-Illinois did not engage in any act or practice with respect to his compensation, placement, promotion or termination, which discriminated against Robert Harold or had any adverse impact or effect upon him because of his race.

## CONCLUSIONS OF LAW

■ Defendant Owens-Illinois did discriminate against Robert Harold on the basis of his race in violation of 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq., and Robert Harold is entitled to compensatory damages in the amount of $5,000, and punitive damages in the amount of $15,000.

## CLAIM OF ALICE BRICE

1. Alice Brice is a Black woman who has been employed by Defendant from May 18, 1964 to the present time.

2. That Alice Brice has a B.S. Degree in business which she received prior to applying to Owens-Illinois for work.

3. That Alice Brice received a teaching credential as a result of her graduation from college in the State of Arkansas and subsequently in 1969 received one from the State of California.

4. That when hired at the company, Alice Brice was assigned the job of traffic clerk. She was promoted to the job of shift dispatcher on July 1, 1972 and was then promoted to traffic representative on August 16, 1974, to Traffic Supervisor on August 1, 1977, and she continued to hold that job as of the time of trial.

5. That despite her college degree and experience with the company Ms. Brice was refused on the basis of her race and sex a job in the industrial engineering department which is the normal position for management trainees, even though she requested such placement.

6. That a supervisor told Alice Brice that she was not to speak to another Black employee who was a teletype operator and who had to converse with Alice Brice in the course of her daily work. Other women in the department spoke to each other, but no White woman was ever told to cease speaking to other women in the department.

7. That Alice Brice took a leave of absence for her pregnancy on January 31, 1972. She was allowed only six weeks for pregnancy leave even though other employees were allowed six months.

8. As a result of discrimination experienced at the company, Alice Brice experienced serious hypertension while she was pregnant in 1972 and had to be treated for this. The diagnosis was confirmed by the company doctor as well as her treating doctor.

9. That Alice Brice, while in the traffic department did her work very well and needed very little supervision and was very accurate.

10. That Alice Brice complained to the Fair Employment Practices Commission of the State of California in 1971. A representative of the organization called Mr. Bart Oxley who stated that she did not have to pursue the complaint with the FEPC since he understood that her supervisor was a problem and he would try to take care of it. Nothing was changed as a result of this complaint.

11. Soon after this, upon return from maternity leave, Alice Brice was offered the job of shift dispatcher on the swing shift. She was told that this was to include a pay increase and an 8% shift differential and overtime pay for working on Sunday.

12. That because of her race and sex no pay raise was given to Alice Brice when she took over the job of shift dispatcher which was one grade level higher than her previous job; she was also not given a shift differential and overtime pay as had been promised to her.

13. That because of her race and sex when she became radio dispatcher she was

ordered to take on the additional duties of the shipping clerk on her shift, which included typing and filing. At that time there were three other radio dispatchers, all of whom were White males. Alice Brice was the first female radio dispatcher. None of the other radio dispatchers had to do the work of the shipping clerk. The shipping clerk who had previously worked on the same shift as Alice Brice was moved off the shift and only Alice Brice was told to do that work. There was no extra pay for doing this work.

14. Alice Brice was also ordered to take on additional duties of receiving records and time cards which the other dispatchers did not have to do.

15. Charles Santillanes, whose job Alice Brice took over, was directed by the supervisor of that department that he should not train her because he did not want her in the department.

16. During this time she worked as dispatcher and also doing the extra work as shipping clerk, she was suffering from glaucoma, dizzy spells, and general hypertension. She had to take medication for the hypertension from this time in 1973 and has continued to have to take it through the present time.

17. Alice Brice requested to be trained as a service representative in the spring of 1974. There was no posting system for higher level salaried jobs and she was never invited to take any jobs other than the shift dispatcher job up until that time. The only way to obtain a promotion in the higher level salaried range was to be offered a job by a supervisor or higher management person. Sometime after 1974 a promotion committee was set up to review some of the management promotions. It did not review all promotions as some supervisors still made their own decisions.

18. That Alice Brice, after making this request, approached Willie Huff, the EEO Coordinator at the plant, as a member of the promotion committee in an attempt to get promoted into the service department. She was informed that the head of the service department felt that women should stay home and have babies and she could not get the job. Upon objecting to the refusal to Bart Oxley, the personnel director, Alice Brice was told it was the feeling of the company that she would be offensive as a service representative although he would not explain the remark and had not so treated White employees. Alice Brice was qualified for that job.

19. That on September 23, 1972 Alice Brice, with other Black employees, signed a petition addressed to management officials of Defendant complaining of the lack of opportunities for Black employees. As a result she was called into the office of her supervisor and told that she was not discriminated against by him but he admitted her prior supervisor had discriminated against her.

20. In 1974 Alice Brice requested consideration for the traffic representative job which she discovered was to be vacant. She spoke to her immediate supervisor, but he did nothing to assist her in getting the job and therefore she wrote a letter to Mr. Willie Huff, the EEO Coordinator.

21. That Alice Brice was not considered as the primary candidate for the job by the plant manager and the personnel director at the promotion committee meeting. Subsequent to the meeting a letter was written by Mr. Huff, the EEO Coordinator, further recommending Alice Brice and subsequently on August 16, 1974 Alice Brice was then given the job of traffic representative, but only on condition that she take certain courses that White males before her had not had to take.

22. That because she was Black her authority was not supported by management when a White subordinate would not work for her and walked off the job. The employee was not penalized for her behavior and received a transfer to another department.

23. That when Alice Brice was given the traffic representative job she received a pay increase from $770 to $850 per month, the minimum salary range for her new job. Even though the job was ordinarily an ex-

empt job, her starting salary was too low to consider her exempt, so therefore she was initially considered a non-exempt employee and was paid for over-time.

24. That after receiving this job Alice Brice again requested to be trained as an Industrial Engineer and asked to be considered for distribution manager in the warehouse. Because of her race and sex no response was given to her by her supervisors and management officials on this request.

25. That on September 9, 1974, Alice Brice signed a letter directed to the President of the corporation complaining of racial problems in reference to the letter previously sent in 1972. Alice Brice was a signatory among six Black individuals who signed the letter (Exhibit # 70).

26. That because she was Black and a woman she was not allowed to take the Dale Carnegie course that was generally given to all management personnel at Owens-Illinois by her supervisor when she specifically requested it.

27. That because of her race and sex she was denied the job of trucking supervisor, for which she was qualified, since she knew about rates and tariffs and had previously worked in the shipping department. Upon complaining about this to management she was informed by her supervisor that the shipping supervisor, Dave Hattig, said he wasn't ready to have a woman report to him.

28. That Alice Brice continues to request and is qualified for promotions but, because of the intentional discrimination of Defendant she has received none since 1977.

29. The acts of Defendant described above had the purpose and effect of discriminating against Alice Brice because of her race and sex and her actions to combat the discriminatory acts of Defendant.

30. Alice Brice has suffered a loss in pay as a result of said discriminatory practices described above in an amount equal to the difference between the wages and salary actually received by her and the sum she would have received had she been earlier promoted to the jobs for which she was qualified, and which were filled by others. The amount shall be computed after further hearing.

31. That Alice Brice suffered a serious medical and nervous condition since 1972 due to the discrimination caused by Owens-Illinois for which she has been continually treated at Kaiser Hospital. Said discrimination also affected her private life and caused marital problems between her and her husband. She had a worsening of the glaucoma problem in her eye and has had rashes, hair loss and sleeping problems.

## CONCLUSIONS OF LAW

■ Defendant Owens-Illinois did discriminate against Alice Brice on the basis of her race and sex in violation of 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., and Alice Brice is entitled to a judgment against Owens-Illinois, Inc. in the amount of $50,000 compensatory damages, $15,000 punitive damages and back pay in an amount to be fixed by the Court after further hearing.

## OTHER INDIVIDUAL CLAIMS

### LOUIS ALTHEIMER

1. Louis Altheimer is a Black male employed at the Oakland Plant since July 22, 1963.

2. Louis Altheimer filed an EEOC charge against Owens-Illinois on April 7, 1977.

3. Since March 7, 1971, Owens-Illinois did not engage in any act or practice with respect to his compensation, terms of employment, promotions, demotion, or treatment, which discriminated against, or had any adverse impact or effect upon, Louis Altheimer because of his race.

4. Louis Altheimer was not offered the position of a salaried foreman at a salary less than the salary being offered to another person who was not Black.

5. Louis Altheimer was demoted in March, 1977 from relief foreman to fork lift driver because of his harassment of two

female employees at the Oakland Plant, his becoming involved in an altercation with a subordinate employee, his general poor work performance, and his inability to perform the job of relief foreman. The demotion was in no way based upon the fact that he was Black.

6. There was no credible evidence that Louis Altheimer was harassed or discriminated against in job assignments, or disciplined, or criticized in any manner because of his race.

## MARSHALL DAILEY

1. Marshall Dailey is a Black male who was hired at the Oakland Plant on November 3, 1969 and was terminated on July 12, 1972.

2. Marshall Dailey filed an EEOC charge on August 3, 1972.

3. Since March 7, 1971 Owens-Illinois did not engage in any act or practice with respect to his promotion, termination, treatment, compensation, terms, condition or privileges of employment which discriminated against or had any adverse impact or effect upon Marshall Dailey because of his race.

4. Since March 7, 1971 Owens-Illinois did not assign the most difficult, onerous, or dirty jobs to Black employees as a class, or to Marshall Dailey individually.

5. On July 7, 1972 Marshall Dailey refused to perform work properly assigned to him by his foreman and he walked off the job without authority. He was terminated because of his refusal to work and his having walked off the job. Such termination was uniformly applied to Owens-Illinois employees who engaged in similar conduct, and was not applied to Marshall Dailey because of his race.

6. Since March 7, 1971 Owens-Illinois did not retaliate against any employees, including Marshall Dailey, because of their complaints to the EEOC, or to company management.

## GAIL GARRETT

1. Gail Garrett is a Black female who was hired at the Oakland Plant on December 16, 1970. She was terminated on January 14, 1975.

2. Gail Garrett filed an EEOC charge on February 7, 1975.

3. Since March 7, 1971, Owens-Illinois did not engage in any act or practice with respect to her compensation, promotion, termination, treatment, terms, condition or privileges of employment which discriminated against Gail Garrett, or had adverse impact or effect upon her because of her race.

4. Since March 23, 1974, Owens-Illinois did not engage in any act or practice with respect to her compensation, promotion, termination, treatment, terms, condition or privileges of employment which discriminated against Gail Garrett, or had any adverse impact or effect upon her because of her sex.

5. Owens-Illinois did not refuse to rehire Gail Garrett after her termination because of her race or sex.

6. Owens-Illinois did not refuse to give Gail Garrett training as a PBX operator and a teletype operator because of her race.

7. The failure to promote Gail Garrett to keypunch supervisor was not because of her race or sex.

8. Gail Garrett was not required to do more work than either male or White employees doing the same job or receiving the same pay as she, nor was she required to do more work or work under more severe conditions because of her race or sex.

9. The request made to Gail Garrett to work during the strike in 1974, or the request for her to work during July 4, 1974, or during evenings, were requests made of other salaried employees and were not made to her in an attempt to harass her or mistreat her because of her race or sex.

10. Gail Garrett was discharged on January 14, 1975 for cause because of her insubordination and conduct which created an irreconcilable conflict between Gail Garrett and her supervisor, Mary Villa. The dis-

charge was not because of her sex, or because of her race.

## CHARLOTTE HARRIS

1. Charlotte Harris is a Mexican-American female who was hired at the Oakland Plant on August 3, 1966. She entered an apprenticeship program at the Oakland Plant on January 30, 1975, and was terminated from that program on December 30, 1976. She is currently an employee at the Oakland Plant.

2. Charlotte Harris filed an EEOC charge on January 11, 1977.

3. Since March 23, 1974, Owens-Illinois did not engage in any act or practice with respect to her compensation, placement, training, promotion, treatment, terms, conditions, or privileges of employment which discriminated against Charlotte Harris or had any adverse effect or impact upon her because of her race or sex.

4. Since March 23, 1974, Owens-Illinois did not discriminate against Charlotte Harris in admission to, or termination from, any program established to provide apprenticeship or other training because of her race or sex.

5. The requirement that Charlotte Harris take certain courses in her apprentice program was a requirement uniformly applied to all apprentices, and was not a requirement of Charlotte Harris because of her sex or race.

6. The requirement that Charlotte Harris enter the apprentice program, and the refusal to make her a maintenance mechanic without such apprentice program was uniformly applied to persons of her ability and qualifications to perform the job of maintenance mechanic, and was not a requirement of Charlotte Harris because of her race or sex.

7. Charlotte Harris was not harassed, or subjected to treatment or requirements not required of other persons in the apprenticeship program.

8. The requirement that Charlotte Harris complete a mathematics course was a requirement uniformly applied to all ap-prentices. Charlotte Harris failed to complete the mathematics courses within the time required. She was terminated by the joint apprentice committee composed of (1) members of the union which represented persons in the maintenance department and (2) members of management. She was terminated because she failed to complete the mathematics course.

9. Charlotte Harris has been promoted and has received pay increases comparable to other employees of equal seniority and ability, without regard to their race or sex. There is no evidence that she was denied any promotion or denied any pay raise because of her race or sex.

10. When Charlotte Harris was terminated from the apprenticeship program, she returned to a job in the Selecting Department. This was the only vacancy available. The return of Charlotte Harris to this job was not a reduction in pay or mistreatment in terms or conditions of employment because of her race or sex. She has subsequently been promoted when other jobs became available as a result of her seniority.

## JUDY WEEK

1. Judy Week is a White female who was employed at the Oakland Plant on June 16, 1965.

2. Judy Week filed an EEOC charge on June 29, 1976.

3. Since March 23, 1974, Owens-Illinois did not engage in any act or practice in connection with her compensation, training, promotion, treatment, or terms, conditions, or privileges of employment which discriminated against Judy Week, or had any adverse impact or effect upon her, because of her sex.

4. From March 23, 1974, to the time of trial, Judy Week was promoted to cost and budget clerk and later to cost accountant in the central mold shop. She was not denied any promotions because of her sex.

5. In late 1975, Judy Week was asked to perform additional duties. Her supervisors complained that she was unable to perform

these duties adequately, and Judy Week admitted that she was unable to perform these duties. The complaints of her performance were not harassment of Judy Week because of her sex.

6. In early 1976, Judy Week complained that she needed training for her job. A program was established to provide for her training. She was not denied training because of her sex.

## CURTIS WILLIAMS

1. Curtis Williams was employed at the Oakland Plant on October 21, 1964. He was terminated on May 19, 1972.

2. Curtis Williams filed an EEOC charge on January 21, 1975.

3. In 1973, Curtis Williams sought reemployment at the Oakland Plant. He was denied employment at the Oakland Plant, but was hired by the Forest Products Division of Owens-Illinois at a plant in Union City, California. Curtis Williams voluntarily terminated his employment at the Forest Products Division plant in Union City, California on February 6, 1973.

4. Since March 7, 1971, Owens-Illinois did not engage in any act or practice with respect to termination, compensation, training, promotion, treatment, terms, conditions, or privileges of employment of Curtis Williams which discriminated against him, or had any adverse impact or effect upon him, because of his race.

5. The failure of Owens-Illinois to rehire Curtis Williams at the Oakland Plant was not because of his race.

6. Curtis Williams was not denied any promotions because of his race, or because of any retaliatory action against him because of complaints to management.

7. Curtis Williams was not denied a promotion to foreman because of his race.

8. Owens-Illinois did not harass Curtis Williams or treat him differently than other employees.

9. In May, 1972, Curtis Williams failed to report to work for a five day period and was terminated. Termination for failure to report to work for five days was equally applied to all employees, regardless of race, and Curtis Williams was not terminated because of his race.

10. At all times Curtis Williams was paid wages as provided by the agreement between Owens-Illinois and the union which represented the employees in the department where Curtis Williams worked. He was not denied any pay, nor was he treated differently with respect to pay, because he was Black.

## EUGENE WILLIAMS

1. Eugene Williams is a Black male who has been employed at the Oakland Plant since July 10, 1964.

2. Eugene Williams filed an EEOC charge on September 3, 1971.

3. Since March 7, 1971, Owens-Illinois did not engage in any act or practice with respect to his compensation, training, promotion, treatment, or terms, conditions, or privileges of employment which discriminated against Eugene Williams or had any adverse impact or effect upon him because of his race.

4. Eugene Williams was promoted to a crew leader in 1974. At no time prior to that was he denied any promotion because of his race, and at no time prior to that was any person, less senior or less qualified, appointed to a crew leader job ahead of him.

5. Owens-Illinois did not deny Eugene Williams the right or ability to become a member of the International Brotherhood of Teamsters.

6. Owens-Illinois did not assist any persons to become members of the International Brotherhood of Teamsters and did not refuse to assist Eugene Williams to become a member of that union because of his race.

7. Eugene Williams was offered an apprenticeship position in the Maintenance Department, which he refused. Owens-Illinois did not permit any person to become a maintenance mechanic with similar or fewer qualifications than Eugene Williams.

He was not denied the opportunity to immediately become a maintenance mechanic because of his race, but was denied the job because of his inability to perform the work required of a maintenance mechanic without apprenticeship training.

8. Eugene Williams was not denied the position of supervisor of the Forming Department or supervisor of the Selecting Department because of his race, but because more qualified persons were appointed in each of those jobs when they became vacant.

9. Eugene Williams was not denied any training which would have permitted him to become a shift foreman.

10. AVO's placed into Eugene Williams' file because of performance or attendance were not placed there because of harassment or retaliation against him because he is Black, or because he has complained to management about discrimination. Such AVO's were customarily placed in the files of other employees, regardless of their race, because of conduct similar to that of Eugene Williams.

11. In 1976, Eugene Williams was appointed to the job of Assistant Selecting Foreman. At that time he had the lowest seniority of any of the persons who were appointed to that position.

12. The shift foremen who were appointed between 1970 and 1976, prior to Eugene Williams, all were employed by Owens-Illinois prior to the time Eugene Williams was employed by Owens-Illinois, and all had greater seniority.

## FLOYD WILLIAMS

1. Floyd Williams is a Black male who was hired at the Oakland Plant on March 21, 1962. Floyd Williams was terminated on September 11, 1974.

2. Floyd Williams filed an EEOC charge on September 23, 1974.

3. Since March 7, 1971, Owens-Illinois did not engage in any act or practice with respect to his termination, compensation, training, promotion, treatment, or terms, conditions, or privileges of employment which discriminated against Floyd Williams, or had any adverse impact or effect upon him, because of his race.

4. Floyd Williams was interviewed for a job as sales representative for Owens-Illinois. His interview was conducted in the same manner in which all interviews of other employees were conducted. The persons interviewing Floyd Williams determined that he was not qualified for the position of sales representative. The decision of such persons was based upon his lack of qualifications, and was not based upon his race.

5. Floyd Williams was not denied the opportunity to participate in the glass bottle quality audits. He declined to participate in such audits because he had outside employment which did not permit him to work overtime.

6. Floyd Williams was not denied any training because of his race.

7. Floyd Williams was not denied any promotions because of his race. Because of his ownership of a motel, he took substantial leaves of absence and did not work overtime.. As a result of such leaves of absence and inability to work overtime, he was not promoted. The failure to promote Floyd Williams was because of his outside activities, and not because of his race.

8. Floyd Williams was not harassed, nor was there any retaliation against him, because of his participation in group meetings where complaints of racial discrimination were made to management, nor was there any retaliation, or harassment, because of his complaints to the EEOC.

9. Floyd Williams was warned for being away from his work in June, 1974. Other employees who were away from their work were terminated. His treatment as a result of the incident was neither harassment nor retaliation.

10. Floyd Williams was terminated September, 1974, because he threatened his supervisor. He had previously been warned about conduct directed towards management. The termination of Floyd Williams

was because of his threatening conduct, and was not because of his race. Any other employee, who had engaged in similar conduct, would have been terminated regardless of that employee's race.

## CONCLUSIONS OF LAW

■ 1. Since March 7, 1971, Owens-Illinois did not discriminate against Louis Altheimer because of his race in violation of either 42 U.S.C. § 1981 or Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.

2. Since March 7, 1971, Owens-Illinois did not discriminate against Marshall Dailey because of his race in violation of either 42 U.S.C. § 1981 or Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.

3. Since March 7, 1971, Owens-Illinois did not discriminate against Gail Garrett because of her race in violation of either 42 U.S.C. § 1981 or Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.

4. Since March 23, 1974, Owens-Illinois did not discriminate against Gail Garrett because of her sex in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.

5. Since March 23, 1974, Owens-Illinois did not discriminate against Charlotte Harris because of her race or sex in violation of Title VII of the Civil Rights Act of 1064, 42 U.S.C. § 2000e et seq.

6. Since March 23, 1974, Owens-Illinois did not discriminate against Judy Week because of her sex in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.

7. Since March 7, 1971, Owens-Illinois did not discriminate against Curtis Williams because of his race in violation of either 42 U.S.C. § 1981 or Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.

8. Since March 7, 1971, Owens-Illinois did not discriminate against Eugene Williams because of his race in violation of either 42 U.S.C. § 1981 or Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.

9. Since March 7, 1971, Owens-Illinois did not discriminate against Floyd Williams because of his race in violation of either 42 U.S.C. § 1981 or Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.

The foregoing Findings of Fact and Conclusions of Law are made this Eighth day of January, 1979.

## JUDGMENT

The trial of this action having commenced on July 12, 1978, before the Court and a jury, and the jury having reached both advisory and binding verdicts on October 2, 1978, and the Court having issued its Findings of Fact and Conclusions of Law on January 8, 1979,

IT IS HEREBY ORDERED AND ADJUDGED as follows:

1. This action is maintainable as a class action pursuant to Fed.R.Civ.P., Rule 23(b)(2), on behalf of the following two classes: (a) all blacks who were employed at defendant's Oakland plant at any time since March 7, 1971; (b) all women who have been employed at defendant's Oakland plant since March 23, 1974.

2. The certified class of all black employees who were employed at defendant's Oakland plant since March 7, 1971, is entitled to no relief, and its claims and the complaint on its behalf are dismissed.

3. The certified class of all female employees who have been employed at defendant's Oakland plant since March 23, 1974, is entitled to equitable relief in the terms of the Remedial Order which is attached hereto as Exhibit 1 and incorporated herein by reference.

4. Plaintiff Robert Harold shall recover from defendant, $5,000 compensatory damages and $15,000 punitive damages, for a total sum of $20,000, in accordance with the verdict of the jury.

5. Plaintiff Aunita Jones shall recover nothing on her claim of sex discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, but shall recover from defendant Owens-Illinois, Inc., $15,000 compensatory damages and $15,000 punitive damages, in accordance with the verdict of the jury, and back

pay in the amount of $6,888.50 in accordance with the Court's Findings of Fact and Conclusions of Law, for a total sum of $36,888.50 for violation of 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*

6. Plaintiff Alice Brice shall recover from defendant, $50,000 compensatory damages and $15,000 punitive damages in accordance with the verdict of the jury and back pay in the amount of $15,061.34 for violations of 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and defendant is further ordered to pay Alice Brice, for services commencing on April 1, 1979, the sum of $1,866.24 per month and to continue payment at such rate until the salary rate of the job she is actually performing shall exceed such rate, at which time her salary shall then be fixed by the regular salary rate.

7. Plaintiffs Louis Altheimer, Marshall Dailey, Gail Garrett, Charlotte Harris, Judy Week, Curtis Williams, Eugene Williams, and Floyd Williams each shall take nothing, and all claims of these defendants are dismissed on the merits.

8. The prevailing plaintiffs are awarded: (a) their costs, taxable under 28 U.S.C. § 1920, pursuant to Fed.R.Civ.P., Rule 54(d), and (b) a reasonable attorneys' fee, which is fixed, after due consideration of all circumstances, at $50,000.

9. The Court retains jurisdiction for the purpose of determining the nature and extent of the relief to be awarded to the class of female employees under the Remedial Order.

## EXHIBIT 1

## REMEDIAL ORDER RE THE CLASS OF FEMALE EMPLOYEES

The Court having considered the parties' suggestions as to the relief appropriate to the Class of Female Employees, and a hearing thereon having been held on February 16, 1979, this Court now makes this Remedial Order in accordance with its Findings of Fact and Conclusions of Law entered January 8, 1979.

### *Injunctive Relief*

I. Owens-Illinois is hereby enjoined from discriminating against women on account of their sex by unduly limiting the hiring of women for management training positions or by unduly limiting the promotion of women to supervisory and management level jobs.

II. Owens-Illinois is hereby ordered to implement the procedures and standards set forth below.

A. *Development of Job Descriptions and Employee Qualification Standards and Training Opportunities*

(1) Within sixty (60) days of entry of judgment Owens-Illinois shall develop job descriptions for all supervisory/management positions at the Oakland plant.[1] Such job descriptions shall specify the duties and functions of, and the job-related qualifications necessary to perform, each salaried supervisory/management job, including the salary, duties, hours, supervisor, employees supervised, responsibility, working conditions, and, where applicable, special qualifications, skills, strength, education, experience, prerequisite training, etc. Owens-Illinois shall revise these job descriptions whenever necessary to conform them to job-related changes with respect to efficient and safe performance of such job(s).

(2) Within ninety (90) days of entry of judgment Owens-Illinois shall perform a "skills inventory" questionnaire [in a form-

---

1. The term "supervisory/management positions" as used herein shall be defined to include all management training positions, including but not limited to the position of student industrial engineer in the cost control department; all crew leaders and working foremen, union or non-union, who are responsible for supervising the work of one or more other persons, including but not limited to relief foremen and like foremen positions; and any other positions where the employee is responsible for supervising one or more employees in their work, but shall exclude the top five positions at the Oakland plant.

at substantially similar to Exhibit A] at the Oakland plant to ascertain for all current and future hourly and salaried employees their individual level of education, prior work experience [with Owens-Illinois and other employers], and interest in "placement" in salaried jobs at the Oakland plant which become vacant in the future. The "skills inventory" shall be periodically updated as necessary. An employee may elect not to complete the "skills inventory" questionnaire, but at any subsequent time such employee may request and complete a "skills inventory" questionnaire.

(3) Within sixty (60) days of entry of judgment Owens-Illinois shall notify all female employees of all current salaried supervisory/management training programs, including, where applicable, scheduled date(s) and the application procedure necessary to obtain consideration for enrollment.

B. *Procedures for Selection of Employees to Fill Salaried Supervisory, Management, and Management Trainee Vacancies*

(1) Owens-Illinois shall post conspicuously on one or more designated bulletin boards in the Oakland plant a JOB POSTING—NOTICE OF VACANCY (including, at least, job title, duties, salary, and any special qualifications reasonably required, together with the legend *"Both Female and Male Applicants Encouraged"*), for each salaried supervisory, management and management trainee job vacancy position at the plant and shall make available upon request the description of and qualifications for such job as developed in accordance with Paragraph II.A(1) above. (The notice should, unless otherwise necessary, be posted at least eight working days before the job is filled.)

(2) Owens-Illinois shall accept from interested employees or other applicants written applications for such posted job vacancies in a form similar to Exhibit B for a period of at least five working days. (Owens-Illinois may, if necessary, fill the job on a temporary basis until the full selection procedure can be accomplished.)

(3) Selection of the employee or other applicant for all salaried supervisory/management and management trainee position vacancies except the top five positions at the plant shall be made by the following procedure:

(a) All applications will be considered;

(b) All employees will be considered who have the necessary qualifications as reflected in the "skills inventory";

(c) If there are no female applicants or candidates for any salaried supervisory/management or management trainee vacancy, then Owens-Illinois shall solicit interest from qualified current Oakland plant female employees and/or from qualified females otherwise available.

(d) Owens-Illinois may also consider for any vacancy such qualified persons without regard to sex who may be otherwise available from outside the Oakland plant, including persons presently employed by the Company at another facility or "new hires" from the Oakland plant recruiting area.

(e) From the candidates selected under the procedures contained in B(3)(a)–(d) above, the supervisor or management official with a requirement to fill any salaried supervisory/management or management trainee vacancy will interview such candidates and thereafter will recommend in writing to the plant administrative manager the top three individual candidates deemed "best qualified", ranking them in order of selection choice with the reason(s) therefor.

(f) In making such recommendation, the supervisor or management official with a requirement to fill any salaried supervisory/management or management trainee vacancy shall consider the candidates' job qualifications, disciplinary records attendance and medical records, length of service (but length of service or seniority is not required to be a controlling factor entitling any candidate to be selected), experience, education, prior training, job performance ratings, interest in the vacant position, and any other factor unique to the job vacancy. The factors which are determinative shall

be reflected in writing in the recommendation made to the plant administrative manager.

(g) From the supervisor's or management official's recommendation and from the information available with respect to all other candidates based upon applications on file and the "skills inventory", the plant administrative manager shall select the "best qualified" person to fill the particular job vacancy.

(h) Those who file applications for the vacant job shall be notified promptly in writing who has been selected to fill the vacancy; and unsuccessful candidates, upon request, shall be advised of the reason(s) why they were not selected.

(i) All candidates not selected shall be offered counseling by the plant administrative manager and/or the supervisor or management official who was responsible for filling the vacant job as to how they should prepare for future vacancies in such job, such as specification of additional work, experience, education, training, or other such factors.

C. *Record Keeping, Reporting, Dispute Resolution*

(1) For a period of two years from the date of entry of judgment, Owens-Illinois shall maintain written records of the foregoing standards and procedures, including copies of all job descriptions, skills inventory records, notices of educational and/or training opportunities, notices of salaried supervisory/management and management trainee position vacancies, applications for such vacancies, supervisor or management official recommendations, notices of filling of vacancies, and requests of unsuccessful applicants for reason(s) required by this Order. For this two-year period, Owens-Illinois shall semiannually file with the Court on August 31 and February 28 of each year a report reflecting the manner in which it has complied with this Order.

(2) In the event that any claim of sex discrimination arises with respect to the filling of any supervisory/management or management trainee vacancy under this Re-

medial Order within two years from the date of entry of judgment which the job applicant desires to pursue to this Court, such claim shall be referred by this Court to a United States Magistrate for proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636 and Local Rule 405.

*Monetary Relief*

I. Proceedings to determine whether back pay should be awarded to any individual member of the Class of Female Employees are referred to the Honorable Fred C. Woelflen, United States Magistrate, or if he is not available to such other Magistrate as the Chief Magistrate may designate.

II. On or before [*a date 3 weeks after resolution of any post-trial motions*], Owens-Illinois will give notice in substantially the same form as Exhibit C to the Class of Female Employees by distributing to each class member currently employed at the Oakland plant a copy of that notice and Claim Form (Exhibit D) with her paycheck. Notice to class members no longer employed at Owens-Illinois shall be by first-class mail (addressee only return receipt requested) to the most recent address for which Owens-Illinois has record. Copies of the notice shall also be posted on bulletin boards at the Oakland plant used for communication with employees. An official of Owens-Illinois shall certify to the Court compliance with this paragraph.

III. On or before [*a date 30 days after the notice date*], each class member who wishes to make a claim for back pay shall return to the Court the Claim form (Exhibit D). No back pay claims shall be considered unless the Claim form has been completed and returned to the Court by the specified date, or contains a postmark no later than the specified date.

IV. On or before [*one week after return date*], the Clerk shall make available for pick-up by counsel for each side copies of the Claim forms which have been submitted.

V. On or before [*two weeks after pick-up of Claim forms*], or at a later date convenient to the Magistrate's Calendar, a status conference shall be held before the Magistrate to which this matter has been referred. At the status conference the following matters, listed by way of illustration and not limitation, shall be discussed:

A. Procedures for determining individual back pay claims;

B. Hearing dates; and

C. Any other matters relevant to the conduct of the hearings.

The Magistrate shall file a written order setting forth the procedures to be followed in determining the validity of back pay claims.

VI. The Magistrate will handle these proceedings in accordance with the Federal Rules of Civil Procedure and Federal Rules of Evidence. At the conclusion of all of the back pay proceedings, the Magistrate shall submit to the Court his Findings of Fact and Recommendation for Disposition with respect to each claimant who has appeared at a hearing.

#### Special Defense in Proceedings Before Magistrate

In the proceedings before the Magistrate that are referred to in the Sections "Injunctive Relief" (Paragraph II.C.(2)) and "Monetary Relief," the Magistrate is precluded from considering the merits of a claim if defendant shows that claimant, in connection with the claim, had, at the relevant times, an adequate remedy under a collective-bargaining agreement.

#### *Jurisdiction*

The Court retains jurisdiction until the four semi-annual reports required by Paragraph C(1) above have been filed with the Court for the purpose of assuring compliance with the provisions of this Order. The action will be dismissed thirty (30) days after the filing of the last such report, unless a party hereto shows good cause for the Court to retain jurisdiction further.

### EXHIBIT A

#### SKILLS INVENTORY FORM

NAME: _____ DATE: _____

DEPARTMENT: _____ SHIFT: _____

Background and Skills

1. Education (Circle highest year completed)
 Grammar School 1 2 3 4 5 6 7 8
 High School 9 10 11 12
 College 1 2 3 4

2. Are you presently enrolled in any educational or training programs?
 Yes _____ No _____
 If yes, describe course(s).

3. List the skills you presently have (for example, typing, shorthand, computer, engineering or other technical skills).

 _____

4. List skills you would like to learn. _____

 _____

5. List or describe any other special skill or ability which you believe supports your employment goals at Owens-Illinois. _____

 _____

Work Experience

Describe any employment (outside Owens-Illinois) where you gained experience which supports your future goals. _____

_____

_____

Areas of Interest

Consider each of the following areas of work and list the jobs in each area which are of most interest to you.

1. Administrative
 a. Industrial Engineering

 _____

 _____

 b. Accounting

 _____

 _____

 c. Purchasing

 _____

 _____

 d. Industrial Relations

 _____

 _____

 e. Others

 _____

 _____

2. Manufacturing
 a. Finished Products

 _____

 _____

 b. Quality Assurance

 _____

 _____

 c. Selecting

 _____

 _____

 d. Corrugating

 _____

 _____

 e. Others

 _____

 _____

3. Production
 a. Forming

 _____

 _____

 b. Apprentice Programs

 _____

 _____

 c. Batch and Furnace

 _____

 _____

 d. Mold Repair

 _____

 _____

e. Machine Repair

_____
_____

f. Others

_____
_____

## EXHIBIT B

### SALARIED JOB APPLICATION

JOB APPLIED FOR: _____

1. NAME: CLOCK #:
2. DATE OF HIRE WITH O-I:
3. CURRENT JOB AND SHIFT:
4. HAVE YOU READ THE JOB DESCRIPTION FOR THIS JOB?
5. DESCRIBE BRIEFLY ANY EDUCATION, TRAINING OR WORK EXPERIENCE WHICH YOU THINK QUALIFIES YOU FOR THIS POSITION: _____

Date:

_____
Signature

## EXHIBIT C

### LEGAL NOTICE

TO: All females who were employed at the Oakland Plant of Owens-Illinois, Inc. since March 23, 1974.

On March 15, 1979, the United States District Court for the Northern District of California determined that from March 23, 1974 until January 8, 1979 Owens-Illinois, Inc. ("Owens-Illinois"), at its Oakland Plant, discriminated against its female employees on account of their sex by unduly limiting the initial hiring of women for management training positions and unduly limiting the promotion of women to supervisory and management level positions. You may have been affected by such discrimination.

Injunctive relief has been granted in the Remedial Order Re Class of Female Employees which is enclosed with this Notice. You should carefully study the provisions of the Remedial Order, and you should seek explanation of its terms if you are uncertain of its effect on you or your job.

Court proceedings will be held to determine whether any of you are entitled to back pay. To be entitled to back pay you must show that but for Owens-Illinois, Inc.'s discrimination against you during the period from March 23, 1974 to January 8, 1979, in refusing you management training, or refusing you a promotion to a supervisory or management level position on account of your sex, you would have a better job, or have earned more money than you did, in fact, earn. To be entitled to back pay, you must show that with respect to some job vacancy.

(1) You applied for that vacancy

 or

 You would have applied for that job but you were deterred from applying because you believed a Company policy made your applying a useless act because you are a woman;

(2) You were qualified for the job

(3) You did not receive the job; and

(4) The job was awarded to a male.

Owens-Illinois can rebut your claim of discrimination by showing that it did not award you the vacant job for non-discriminatory reasons, for example, because a more qualified applicant was available. If Owens-Illinois makes such a showing you must then prove that the reason Owens-Illinois gave for not selecting you was a mere pretext, that is, that it was not the true reason for denying you the job and that the true reason was because of your sex.

In order to present a claim for back pay you must complete the attached Claim form and return it to the address shown below by no later than [*date 30 days from notice*].

*Floyd Williams, et al. v. Owens-Illinois, Inc.*
Clerk, United States District Court
Federal Office Building
450 Golden Gate Avenue
San Francisco, California 94102

If you do not return the Claim form, any claim to back pay which you may have as the result of discrimination on account of your sex by Owens-Illinois during the period March 23, 1974–January 8, 1979, *will be waived*, and when the final decree and judgment is entered in this case, *you will be bound by that judgment* whether or not you received a back pay award.

You are entitled to have an attorney represent you in these proceedings. You may choose to be represented by your own attorney. Otherwise, the plaintiffs' attorneys will represent you if you wish them to do so. They are the firm of Withy, Gould, Miller & Gertsler, 2222 Grove Street, Berkeley, California 94704. You may consult these attorneys for information regarding this case or any claim you may have in connection with it.

EXHIBIT D

CLAIM

1. Name:

2. Social Security Number:

3. Owens-Illinois Identification Number:

4. Date first employed by Owens-Illinois:

5. If employment not continuous,
 (a) list any break(s) in service:
 (b) list any re-employment dates:

6. List each specific job vacancy(ies) for which you believed yourself qualified:

7. List your qualifications for each such job vacancy:

8. For such job, list
 (a) when you believe you were qualified for that job:
 (b) the date when you applied or otherwise sought to be selected (If you did not apply, explain why):
 (c) the result or response from Owens-Illinois:
 (d) the name and sex of the person who was selected for that job, if you know:
 (e) your supervisor at the time you applied for or sought the position:

9. If you are no longer employed by Owens-Illinois, list all jobs held since you left Owens-Illinois including:
 (a) employer;
 (b) employment dates;
 (c) job title and description;
 (d) pay (including all increases, fringe benefits and other compensation), and
 (e) reason for leaving.

If you have not held a job since you left Owens-Illinois explain why not.

I declare under penalty of perjury that the above statements are true and correct.

Dated:

_____
Name

_____
Address